In the Matter of the Application of MARY E. BRADY, Petitioner, for a Mandamus Order against THE BOARD OF EDUCATION OF THE CITY OF NEW YORK, Respondent.

Supreme Court, New York County, February 18, 1930.

*Davis, Polk, Wardwell, Gardiner & Reed* [*William C. Cannon* and *Francis W. Phillips* of counsel], for the petitioner.

*Arthur J. W. Hilly, Corporation Counsel* [*William E. C. Mayer, Assistant Corporation Counsel*, of counsel], for the respondent.

LEVY, J. This is an application for an order of mandamus made by a teacher in the junior high schools of the city of New York to compel the board of education, for salary purposes, to place her as well as other teachers in that type of school, in the schedules provided for high school teachers. Effective February 1, 1929, the board of education adopted schedule 2-A whereby teachers of the seventh, eighth and ninth years were given a maximum salary of $3,830 for the twelfth and subsequent years of teaching experience, while regular teachers in the high schools, known as assistant teachers, were put under a maximum schedule of $4,500 for the fifteenth and subsequent years of such experience. The petitioner contends that this is an improper discrimination. She cites section 20 of the Rules of the Board of Regents, adopted in 1928, whereby junior high schools are graded and classified as secondary schools, and asserts that these rules have legislative effect. Hence she draws the inference that, since section 882 of the Education Law (added by Laws of 1919, chap. 645) requires uniformity in schedules of salary, teachers in her position have been unlawfully discriminated against, and are entitled to the same salary as those in the other high schools with whom they are said to occupy the same educational rank. Respondent points to section 883 of the Education Law (added by Laws of 1919, chap. 645, as amd.) as specifically authorizing a schedule for junior high school teachers, separate and distinct from that established for regular high schools, and it contends that the Regents' Rules may not contravene the express provisions of the statute.

An intelligent disposition of the question at issue requires a consideration of the status of teachers of junior high schools, in its historical development. The parties, unfortunately, have refrained from enlightening the court on this phase of the subject. This omission has necessitated research into the statutes, judicial decisions and published official reports in order to secure this information. The history of salary legislation as it applies to the New York city school system, is one of the keys to the solution of the problem.

The first teachers' salary law applicable to the city of New York was adopted as part of the Greater New York Charter, enacted by chapter 378 of the Laws of 1897. It became section 1091 of the charter, and provides that schedules of salaries shall be regulated by merit, by the grade of class taught, by length of service, by experience in teaching, or by a combination of these considerations. It also contains the following provision, which may have some bearing on the interpretation of the word " uniform " as employed in the Education Law: " Said salaries need not be uniform through_

out all the several boroughs, or in any two of them, nor throughout any one borough."

At the time of the adoption of the charter a number of rural schools located in outlying sections became a part of the city school system, and it is not difficult, therefore, to understand why provisionally, at least, the salaries paid in the organized city schools were withheld from the others, until such time as they would be completely assimilated. (Report of the City Superintendent of Schools, 1900, p. 62.)

The provision as to the regulation of salaries according to merit, grade of class, etc., has been retained in section 1091 of the charter, enacted by chapter 466 of the Laws of 1901, notwithstanding repeated amendments of the section as a whole. But there has been a complete change of policy as to uniformity of salaries in the boroughs, effected by chapter 751 of the Laws of 1900, known as the Davis Law. While the Ahearn Law (Laws of 1899, chap. 417), which preceded it, frequently characterized as the first humane and progressive step, marked a great advance in teachers' salary legislation by guaranteeing a minimum compensation, it nevertheless appears to sanction the principle of lack of uniformity. The Davis Law, which was in force for eleven years, imposed the following restriction among those already existing, upon the power of the board of education to adopt by-laws dealing with salaries: " Such by-laws shall establish a uniform schedule of salaries for the supervising and the teaching staff throughout all boroughs which schedule shall provide for an equal annual increment of salary * * *." This provision, too, has been retained in all subsequent amendments of section 1091 of the charter and is still the form in which it exists to-day, with parallel wording contained in section 882 of the Education Law, adopted in 1919.

A reading of the Davis Law discloses a line of demarcation established for teachers of the seventh and eighth years of the elementary schools, by providing a schedule of salaries higher than that fixed for teachers of the lower grades. Indeed, an examination for promotion was instituted by the board of education to qualify teachers in the lower schedule to become eligible to teach in the seventh and eighth years. Teachers in the high school, too, under the Davis Law, were placed in at least two classes — junior teachers and assistant teachers, in addition to which there were other classifications for supervisory teachers or first assistants, clerical and laboratory assistants, etc. In other words, differentiated salaries were adopted, based upon grade, within the high schools as well as within the elementary schools.

The Davis Law remained in force until the adoption of chapter

902 of the Laws of 1911, known as the " Equal Pay Law," by which all discrimination by reason of sex of teachers was abolished, and salary schedules authorized with titles of differentiation similar to those which had previously existed. It is to be noted that teachers of the seventh and eighth years of the elementary schools were again included in a separate schedule. The law was amended in minor particulars by chapter 459 of the Laws of 1912, and by chapter 534 of the Laws of 1913 a saving clause was incorporated in the existing statute to assure to men teachers of the seventh and eighth years, who had been in service prior to the passage of the Equal Pay Law, schedules of salary not lower than those under the Davis Law. The legislation of 1911 to 1913 is fresh in my mind because I had considerable to do with its preparation and the promotion of its passage at a time when I was a member of the house and later its majority leader. But as it might be inadvisable in a judicial decision to rely upon personal recollection, I refer to *Matter of Hirschfield* v. *Board of Education* (89 Misc. 115), in which the classification of the elementary school grades, the teachers' promotion system to the seventh and eighth years of the elementary schools, the effect of the Equal Pay Law, and other pertinent matters are appropriately discussed.

Chapter 627 of the Laws of 1917 further amended section 1091 of the Greater New York Charter in matters of detail which need not be presented here. This left the section in its present form, and its provisions are still in force, except in so far as they have been modified by the State-wide salary laws incorporated in article 33-B of the Education Law by chapter 645 of the Laws of 1919. Obviously, this legislation was prompted by the high cost of living and the apparent need to adjust the minimum salaries in accordance with that condition.

Section 882 of that article contains a provision as to uniformity applicable to all cities of the State, whereby the by-laws to be adopted by the respective boards of education " shall establish uniform schedules of salaries for all members of the supervising and teaching staff in each city." It is evident that this provision considered alone is not capable of satisfactory interpretation. But it becomes quite clear when read in connection with section 883, and when traced in its evolution, and more particularly when compared to a similar provision in section 1091 of the charter. As so construed, it has, primarily, reference to a mandatory uniformity of schedules in all territorial portions of the city. This inference is confirmed by the fact that the power to adopt discriminatory schedules — apart from the requirement of keeping them uniform throughout all boroughs and the prohibition of discrimination on

account of sex — is distinctly preserved by the failure to repeal section 1091; by the minimum salary schedules in section 883 of the Education Law, which themselves indicate discrimination based upon the grade, type of school and other considerations; and by various references in the latter section, which would seem to imply that the provisions in the charter, not inconsistent with that statute, are kept alive. The particular schedule in that section of immediate interest is schedule A-2, which fixes minimum salaries for teachers of seven-a to nine-b classes. It is one of the subdivisions under heading " A. Elementary Schools," and is of particular importance in this controversy, because, for the first time, we find a statutory enactment denominating grades nine-a and nine-b as of the elementary schools — grades which are beyond the regular course of eight years ordinarily recognized as the standard. elementary school organization.

Under that heading we also find another subdivision known as schedule A-5, which fixes the minimum salary for principals of the elementary schools. Here, a new type of school is mentioned — the intermediate school or junior high school. While no distinction is made between the various types of elementary or quasi-elementary schools, a mandatory provision is inserted for adjusting schedules of principals' salaries after the year 1924, according to size, type and grade of school supervised. Although it amounts to a virtual direction to increase the salaries of principals of junior high schools after that year, beyond the minimum in schedule A-5, it does, nevertheless, recognize the junior high school as akin to the elementary school, possibly by reason of the fact that two of its three years of instruction cover the seventh and eighth years of the elementary, and only one year that of the high school grades.

An understanding of the status of the junior high school at the time of the adoption of the legislation of 1919, is facilitated by a study of the annual reports of the State Education Department to the Legislature. Thus, in volume 2 of the Sixteenth Annual Report, at page 9, a brief survey is made of the current process of reorganization in the school systems throughout the country, to provide for a new type known as the junior high school. The Assistant Commissioner of Education in charge of seondary education there reports: " Meanwhile, the United States * * * is endeavoring to perfect a reorganization of the school system of America whereby the first six years shall be devoted to elementary education designed to meet the needs of pupils of approximately 6 to 12 years of age; and the second six years of secondary education designed to meet the needs of pupils of approximately 12 to 18 years of age. That is, a people of a country of over a hundred

million population is endeavoring to readjust its school curriculum so that the elementary school work may be shortened by two years and the secondary enriched by two additional years.

" That New York State reports little progress in the organization of the so-called junior high school is not evidence of indifference but of a differing condition. For many years, through state appropriations that made possible free access to a high school for every pupil in a common school and through the administration of the Regents whereby the secondary schools of the State, both the high schools and the academies, were graded as junior, middle, senior and high schools, the Department system has not only been feasible in the village and city schools, but throughout the rural districts as well."

The department method, or the departmental system, thus referred to, is the most common feature of the junior high school (20 Ency. Brit. [14th ed.] 258, article on Secondary Education in the United States), and is there defined as " the assignment of subjects to teachers so as to permit at least some measure of specialization, in contrast with the unspecialized teaching formerly universal in upper grammar schools." This form of specialized teaching, universally employed in the regular high school, began as an experiment in the seventh and eighth years of the elementary grades of New York city schools, soon after the adoption of the Davis Law (Report of the City Superintendent of Schools, 1903, p. 73). Some years later another experiment was made in segregating the two upper grades of a number of schools in a district into a single school, under the title of " intermediate school." This was instituted in 1905 (Report of Committee appointed by the Superintendent of Schools to make Survey of Junior High Schools, p. 235). The innovation was, however, confined to a very few districts. Educational policy, coupled with the convenience of the pupil in the matter of travel, caused a ninth year to be added to these schools, to include the work of the first year of the regular high schools. This was inaugurated in three schools in 1915, with the title " intermediate school " unchanged (Report of Committee on Junior High Schools, supra). The step was in line with the growth of the junior high school system throughout the country. It embraced the three mentioned years in a separate unit of organization, either under the same roof with the lower grades or in a separate building.

This reorganization movement, whereby the upper two years of the elementary schools were combined with the first year of the regular high school into an integral unit, was still in course of transition at the time of the adoption of section 882 of the Education

Law (Laws of 1919, chap. 645, in effect May 19, 1919)— as evidenced by the fact that the schedules in the very next section, 883, refer to the seventh, eighth and ninth years as grades of the *elementary* school, and the organization embracing these years is referred to interchangeably as intermediate and junior high school. In any event, however, by placing teachers of these classes within the elementary school schedules, the Legislature indicated that for salary purposes they were not of the true high school type. That this transition movement has by no means been completed is further shown by the recent report of the superintendent of schools of New York city for 1928, at pages 452 and 453, wherein it appears that sixty-seven per cent of the pupils of the seventh and eighth years are still instructed in the old time type of elementary school; sixty-four per cent of ninth year students are in the first year of the four-year high school course, and only thirty-six per cent in the junior high school. The total number of pupils in the grades of the latter for that year is 81,180. The moving papers indicate that this number had risen to 88,435 at or about the time of this application — a total not much in excess of one-third of the entire number receiving instruction in the grades of the seventh, eighth and ninth years.

While the junior high school, in the opinion of educationists, represents an important advance in educational practice in providing a better system of training for children in the early adolescent period, and a decided improvement in articulation between the elementary schools and the high schools, it is none the less an outgrowth of the elementary school system. An express statutory mandate for grading its teachers for salary purposes on a par with those of the senior high schools seems to be wholly lacking. But petitioner professes to find such an implied mandate in the Regents' Rules, which, in certain respects, have statutory force. Under section 20 of the Rules of the Board of Regents, adopted in 1928, secondary schools are graded as junior high schools, middle high schools, industrial high schools, technical high schools, continuation high schools, and high schools. The requirements for the standard of a junior high school are as follows: " A junior high school shall consist of the seventh, eighth and ninth grades, organized as a separate unit, with approved courses of study and approved apparatus and library." Since the larger number of pupils in the seventh and eighth years are not in a junior high school " organized as a separate unit," it would follow, if petitioner's contention is carried to its logical conclusion, that teachers of those two grades would not be entitled to rank as secondary school teachers unless they happened to teach in a school established as a unit which also

included a ninth year. Such an interpretation, while granting teachers of organized junior high schools the pay of regular high school teachers, would deprive teachers in the seventh and eighth years, not so fortunately situated, of this advantage. A construction of this character would be contrary to the principle underlying section 883 of the Education Law, which places teachers of the seventh, eighth and ninth years on a parity. To be sure, it is possible to advance the counter-proposition that the junior high school comprehends within its scheme the ninth year, which is equivalent to the first year of the regular four years' high school, and for that reason its teachers are discriminated against in not receiving high school pay. The answer to this is, that teachers of the first year high school may also, by virtue of their licenses and qualifications, instruct in the grades above that year, whereas teachers in the ninth or highest junior high school grade may not function beyond that grade. (See Education Law, § 872, subd. 3, added by Laws of 1917, chap. 786, and *People ex rel. Bergoffen* v. *Board of Education, infra.*)

Respondent argues that the Regents' Rules in classifying junior high schools as secondary schools are inconsistent with the statute. But it seems unnecessary to assume that the Regents' Rules in so classifying them contravene the Education Law, section 883 of which places seventh, eighth and ninth year grades within the elementary school salary schedules. The statute would appear to so classify them for salary purposes only. On the other hand, for allotment of State moneys to local schools, grades one to eight inclusive, are ranked as elementary grades. (Education Law, § 491-b, subd. 2, added by Laws of 1925, chap. 675, as amd. by Laws of 1928, chap. 591.)* But the Regents' Rules merely deal with the educational status of junior high schools. By placing them in the category of secondary schools, they make them institutions of the University of the State of New York, pursuant to section 57 of the Education Law, which provides that: " The institutions of the university shall include all secondary and higher educational institutions which are now or may hereafter be incorporated in this state, * * *." Such a regulation brings those schools within the particular supervision of the Regents for academic examinations (Education Law, § 48), and for other purposes connected with the administration of the secondary school system. It cannot affect the schedules of minimum salaries required under section 883, since all Regents' Rules are " subject * * * to the constitution and laws of the state." (Education Law, § 46, as amd. by Laws of 1927, chap. 153.)

---

*Since amd. by Laws of 1929, chap. 358.— [Rep.

The schedules in section 883 show a permissible differentiation between the salaries of teachers in the seventh, eighth and ninth grades and those in the high schools. The fact that those grades may be segregated in a separate organization known as a junior high school, which is classified as a secondary school under the Regents' Rules, is immaterial, and does not invoke the mandatory provision of section 882 as to uniformity of schedules of salaries "for all members of the supervising and teaching staff in each city." As I have already observed, the history of the uniformity proviso in its development from the Greater New York Charter shows that it is primarily a safeguard against geographical discrimination by insuring teachers in sparsely settled and outlying parts the same salaries for a given grade and teaching experience as are granted to teachers in other sections of the city. That this is its fundamental intent is further established by the fact that the provisions of section 1091 of the Greater New York Charter are still in effect. And the language of section 872, subdivisions 5 and 6, of the Education Law (added by Laws of 1917, chap. 786) seems to confirm this power of the board of education to adopt licensing and salary regulations in accordance with grade. There is no warrant in the statutes, even assuming that the Regents' rule establishes the status of the junior high school as a secondary school, for petitioner's position that all the various types of high schools constitute but a single grade, to which a uniform salary schedule must necessarily attach.

I might appropriately add here the language of Mr. Justice KAPPER in *People ex rel. Bergoffen v. Board of Education* (79 Misc. 123, 125), where a teacher who held a license which, at the time of its issuance, entitled him to teach in all the grades of the elementary schools, claimed the right to the salary schedule subsequently adopted for teachers of a graduating class, for which special qualifications and appointment from the eligible lists were prescribed by the by-laws of the board of education. The case was one in which the board elevated the highest grade of the elementary school for special salary recognition, and, therefore, presents some analogous features. Said the court: " The contention is serious and one which to my mind is fraught with some considerable peril to the educational system of the city. In fact so much so that if there is a reasonable doubt on this application as to the interpretation to be given to the clause relied on it should in the interests of public education be resolved against the relator." And in arriving at his conclusion, the learned justice said (at p. 129): " Therefore reading the various sections of the charter as the occasion to my mind demands, the clause in question is given a rational, fair and appropriate meaning by limiting it, as I think it ought to be

limited, to lists of those entitled to *appointment* as teachers and that *promotions* were subject to such increased and higher standards and qualifications as the educational requirements of the times should seem to demand." This would seem to dispose of petitioner's contention that when the Regents' Rules classified junior high schools as secondary schools, their teachers became automatically entitled to the pay of senior high school teachers who had been appointed under any appropriate license obtained after an examination of qualified candidates. But, in any event, granting that petitioner's grievance has a sound basis in fact, she has mistaken her remedy.

The preceding analysis of section 883 of the Education Law has indicated beyond peradventure that a salary schedule for junior high school grades different from that established for regular high schools, while not directed, is nevertheless sanctioned by law. True, the schedules establish only minimum rates for a given grade and teaching experience; and it may be conceded that it is within the power of the board of education to increase the rates for one grade so as to make them equal to those of another, where it appears that there is no longer any substantial difference between the teaching qualifications and work to be performed in one grade and those in the other. But would mandamus lie to compel such equalization? One of the clearest answers to this question is found in *Matter of Burr* v. *Voorhis* (229 N. Y. 382, 387), in the language of Judge Collin: " It is established law that it is not the office of a writ of mandamus either to confer powers or to impose duties. The writ issues to compel the performance of official duty clearly imposed by law, where there is no other adequate specific remedy. The duty must be positive, not discretionary, and the right to its performance must be so clear as not to admit of reasonable doubt or controversy. *It is not enough that the act, performance of which is sought, is not prohibited;* its performance must be directed." (Italics mine.)

Such a direction, in the circumstances, to compel the exercise of a proper discretion on the part of the board of education, after a possible basic determination that there has been an abuse of such discretion, is essentially within the province of the judicial power of the State Commissioner of Education, pursuant to section 890 of the Education Law. In *Matter of Louderback* (32 State Dept. Rep. 588) the petitioner took recourse to such an appeal in order to establish that a " visiting teacher " under the salary schedules adopted pursuant to section 883 of the Education Law, was entitled, by reason of her qualifications and the principle underlying the law, to the same salary as a " special teacher." In *Louderback* v. *Board of Education* (216 App. Div. 805; affd., 244 N. Y. 511)

the ruling of the Commissioner of Education was adopted as *res adjudicata*. (See, also, *Caldwell* v. *Board of Education*, 127 Misc. 492.)

It fully appears from the statute that the board *may* adopt minimum salaries for the junior high school lower than those for the older type of secondary school. Whether it *ought* to adopt the same minima is not for the court to say, by way of mandamus. If any one should review the discretion of the board of education, it is the State Commissioner, whom the Education Law, by reason of his educational perspective of school organization and his broad professional attainments, has recognized as eminently fitted to perform a task of this nature.

The application must, therefore, be denied.